IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| ORIX USA CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 5:15-CV-00170 |
| | § | |
| PRESTON HOLLOW CAPITAL, LLC, | § | Jury Trial Demanded |
| | § | |
| Defendant. | § | |

## FIRST AMENDED COMPLAINT

Plaintiff ORIX USA Corporation ("ORIX USA" or "O-USA") files this First Amended Complaint ("FAC") against Defendant Preston Hollow Capital, LLC ("PHC") pursuant to Federal Rule of Civil Procedure 15(a) and would show the Court as follows:

### I.  INTRODUCTION

1.      This lawsuit is the result of PHC's master plan ("The Plan") to steal O-USA's proprietary and confidential information and property, and to siphon O-USA employees to PHC, in an effort to quickly establish the PHC business in competition with O-USA.  PHC was formed in the Fall of 2013 and immediately engaged in the misappropriation, infringement and stealing from its direct competitor, ORIX USA Corporation, illicitly used vast amounts of O-USA resources, including personnel, on work that would benefit Defendant, by corrupting Plaintiff's employees, and by inducing it (in some cases unwittingly) to violate their contractual and common law duties.

2.      When PHC was first formed it had three employees (O-USA CEO Jim Thompson, O-USA President of Municipal Finance Cliff Weiner, and senior O-USA attorney John Dinan) but no business and its address was 5569 Impala South, Athens, Texas 75752.  At all times mentioned in the FAC, Thompson, Weiner, and Dinan were acting as agents and

employees of PHC and their acts were within the course and scope of such agency or employment with PHC, regardless of whether or not they were still employed by O-USA.

3.     No later than the Fall of 2013, Thompson, Weiner and Dinan, masquerading as employees of O-USA—while secretly acting for and on behalf of PHC—set about to fulfill The Plan.  Between October 2013 and January 2014, Dinan, who was Senior Legal Counsel for O-USA at the time, used his Eastern District of Texas residence in Athens, Texas as the corporate base for the operation.  He ran tradename searches and reserved corporate names with the Texas Secretary of State; filed PHC formation papers with the State of Delaware; made applications to the IRS; and applied for trademarks with the United States Patent and Trademark Office ("USPTO")—in connection with which PHC established 5569 Impala South, Athens, Texas 75752 as the address to and from which all communications flowed.  Dinan, on PHC's behalf, used O-USA computers and resources, including an O-USA paralegal, to accomplish these parts of The Plan.

4.     Meanwhile, during this timeframe, PHC commissioned Weiner to use O-USA's network resources and to monopolize O-USA's human resources to develop a "Pitch Book" that charted the O-USA investment track record and reflected other O-USA confidential and proprietary information.  In pressing the O-USA employees to complete the Pitch Book, Weiner reminded them that "nothing is more important than getting this done."  PHC's intent was to use the O-USA Pitch Book and its contents to lure potential business partners and investors to PHC, thereby hastening the creation of a competitor to O-USA.  In the fall of 2013, Weiner—who was still an officer of O-USA—instructed O-USA employees to retain a third party vendor to create identical "pitch books," one for O-USA and one for PHC.  The vendor was instructed to "create the Book for ORIX 1st" and then use "the SAME book for Preston Hollow Capital."  The "pitch

books" contained O-USA's valuable proprietary and confidential information, were maintained on O-USA's computer network, and were to be used for potential customers and investors. Weiner paid the vendor (Ovis Creative) for the pitch books with his personal credit card.

5.     Shortly thereafter, PHC began a targeted marketing effort to disseminate O-USA's Pitch Book to businesses that PHC identified as its potential business partners.  PHC obtained and used O-USA's confidential and proprietary financial information—as well as O-USA's name—to lure potential investors.  Using this information, PHC's agents (many of whom were still working full-time for O-USA) solicited business, courted investors, and worked to build PHC's reputation in meetings and phone calls directed to anyone that could potentially provide capital.

6.     PHC knew that the O-USA employees owed a duty of loyalty to Plaintiff, covenants not to compete, non-solicitation agreements, a duty to avoid conflicts of interest and to protect and maintain the confidentiality of O-USA's business information.  Moreover, every O-USA employee made express ethical commitments regarding the use of O-USA's computer systems, agreeing that those systems—and the data contained therein—would only be used for O-USA business purposes.

7.     In disregard of these common law and contractual obligations and duties, PHC induced Thompson and Weiner to rent office space, solicit senior executives and staff to leave O-USA and misappropriate the O-USA proprietary information, business plan and methods as well as infringe on its trademark through PHC's website and press releases, all while Thompson continued to serve as CEO of O-USA.  Indeed, PHC encouraged Thompson to speak to the press on December 12, 2013, two weeks before he resigned, and in one article was quoted as saying

that "he" had gotten too big for his "partner," O-USA, implying that PHC would be bigger and more attractive than Plaintiff.

8.      On January 7, 2014, within days of Thompson's retirement, PHC issued its initial press release, and it drew extensively on the value of O-USA's name.  At that time, Thompson was still subject to non-compete and non-solicitation agreements with Plaintiff.  The press release mentions O-USA over a dozen times and states that all of PHC's business knowledge, success and acumen was derived from O-USA, which it implied could no longer deliver competitive services to its customers.  By the time of the first press release (several days after Thompson resigned as O-USA CEO) PHC had already, as the release said, "commenced operations with committed capital of $100 million."  Given the date of the press release and announcement, these "commitments" were obtained by Thompson who was still employed by O-USA and subject to non-compete, non-solicitation, and non-disclosure of confidential information agreements.

9.      Once Thompson had departed O-USA, PHC launched its website announcing that PHC was open for business—"formed … by a senior team from ORIX USA comprised of executive management, sourcing, credit and business operations professionals."  The website made numerous other uses of the O-USA name—a practice that was compounded as PHC lured more O-USA employees to it—thereby conflating the two companies' investment strategies and identities.

10.     Defendant's actions have forced O-USA to expend considerable time and resources uncovering the depth of PHC's misconduct and the resulting harm caused O-USA. That unlawful conduct is described in more detail below and exposes Defendant to liability for its wrongful acts as well as those of its agents and employees, damages and attorneys' fees for

trademark infringement, violation of federal statutes protecting against computer fraud and abuse, and unfair competition, as well as common law claims of tortious interference with contractual relations and conversion.

## II.     THE PARTIES

11.     Plaintiff ORIX USA is a Delaware corporation, with its principal place of business at 1717 Main Street, Suite 1100, Dallas, Texas 75201.

12.     Defendant Preston Hollow Capital, LLC is a Delaware limited liability company with its principal place of business at 1717 Main St., Suite 3900, Dallas, TX 75201.  PHC does business throughout the United States, advertises to customers throughout the United States and in the Eastern District of Texas via the internet, uses an Eastern District of Texas address in filings with various state and federal agencies, and solicits business for its services in the Eastern District of Texas.  PHC may be served with process through its registered agent, Capital Corporate Services, Inc., 800 Brazos, Suite 400, Austin, Texas 78702.

## III.     JURISDICTION AND VENUE

13.     This action arises under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the trademark laws of the United States, 15 U.S.C. § 1051 *et seq.*  Accordingly, original jurisdiction over this cause of action is conferred upon this Court pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. § 1338.  This Court has supplemental jurisdiction over the common law claims asserted herein under 28 U.S.C. § 1367(a).

14.     This Court has personal jurisdiction over Defendant because it has substantial, continuous, and systematic contacts with the State of Texas in connection with its business. Defendant regularly conducts and solicits business in the State of Texas and in this District, rents or leases office space and derives substantial revenue from its services within the State of Texas, engages in other persistent courses of conduct within the State of Texas and this District, and

regularly and systematically directs PHC's activities into the State of Texas and this District with the manifest intent of engaging in business within this District.

15.     Venue in this District is proper under 28 U.S.C. §§ 1391(b), (c) and (d).

## IV.    FACTS

**A.     O-USA.**

16.     O-USA is a premier financial services group headquartered in Dallas, Texas and is recognized as a leader in the fields of corporate capital, real estate, municipal finance, asset management, healthcare, energy, and principal investments.

17.     O-USA is the owner of the ORIX USA service mark (the "Mark") for, among other things, financial management and consulting services, investment banking services, loan financing services, and real estate investment consulting services.   The Mark, as used in connection with these services is inherently distinctive to the public and serves primarily as a designation of origin of such services emanating from or sponsored or licensed by O-USA.   O-USA has sold services under the Mark, nationwide including in the State of Texas, for more than two decades.   O-USA has done so to distinguish its services from similar services offered by other companies, by, and without limitation, prominently displaying said Mark in advertising and promotional materials distributed throughout the United States.

18.     O-USA's yearly revenue under the Mark totals in the millions of dollars.   The services provided under the Mark are renowned for their quality, solid financial backing, and are identified and recognized as being exclusively from O-USA by virtue of its use of the Mark.

19.     O-USA's key employees are required to sign and acknowledge a Key Employee Non-Solicitation & Non-Disparagement Agreement ("Key Employee Agreement") as a part of their employment agreement with O-USA.   In executing the Key Employee Agreement those key employees acknowledge agreements with O-USA that (1) O-USA has made confidential and

proprietary information available to them; (2) restrictions on the use or disclosure of confidential and proprietary information apply while they are employed with O-USA and after termination of their employment; (3) they have a key position with O-USA and agree not to use their position, for the benefit of any person or entity or than the company; (4) agree not to disclose or use confidential or proprietary information outside the course and scope of their duties on behalf of the O-USA; (5) agree to return any and all copies of any confidential or proprietary information, in whatever media or form such information may be contained (including any and all electronic copies of such information); (6) agree not to engage in any form of conduct that will affect the commercial interests of O-USA post termination; and (7) agree that for the twelve months following termination of employment with O-USA they *will not* (i) provide information, directly or indirectly, to a competitor, (ii) assist, directly or indirectly, any competitor of O-USA to recruit, solicit, interview, or hire any employee of O-USA, (iii) solicit or encourage, directly or indirectly, any employee of O-USA to terminate employment with O-USA or assist any other person in such efforts, or (iv) contact, directly or indirectly, any employee of the O-USA for such purpose.

20.     The Key Employment Agreement describes confidential and proprietary information as: policies and procedures, business models, administrative procedures and processes, the indemnity, capabilities, skills and compensation of O-USA employees, knowledge of the financial condition of a borrower, customer or vendor, business and financial plans, customer lists, contracts and agreement, internal and external correspondence and reports, reports written by auditors, rating agencies and regulatory agencies, internal communications and electronic mail, electronic files and databases, computer passwords, codes, software, and other information that is used in O-USA's business.

21.     In addition to the Key Employee Agreements, O-USA's Code of Ethics Policy, which is acknowledged annually by its employees, prohibits use or disclosure of inside, proprietary, or confidential information for any purpose other than that for which it has been properly provided to or developed by O-USA.  The Policy prohibits conflicts of interest and requires employees to avoid and immediately disclose financial, personal, ethical, legal or other conflicts of interest involving O-USA.  Examples of conflicts of interests include but are not limited to taking business opportunities, giving tax, legal or financial advice, holding another job outside of O-USA without written approval, and stealing.  The Policy also states O-USA employees have access to confidential and proprietary information, including policies and procedures, business models, administrative procedures and processes, the identity, capabilities, skills and compensation of O-USA employees, knowledge of the financial condition of a company or a person, business and financial plans, borrower and client lists, contracts and agreement, internal and external correspondence & reports, reports written by auditors, rating agencies and regulatory agencies, email, works and inventions, video recordings, electronic files and databases, computer passwords, codes or software, and information received from a third party subject to a confidentiality agreement.

22.     The Policy provides that the aforementioned confidential and/or proprietary information must not be released to anyone outside of O-USA who does not need it in order to perform his or her duties for O-USA and forbids the disclosure or use of such information for the employee's own benefit without written permission from O-USA.  The Policy also states that once an employee ceases to be employed by O-USA, that person must return all material belonging to O-USA, including material containing confidential information and proprietary

information.  The employee is not permitted to keep a copy (electronic or otherwise) of any of this material.

23.     Under the heading "Data Security," the Policy states that all the data and information on its systems is owned by O-USA and may not be disclosed to anyone unless that person has a right to receive it.  In addition, employees are not permitted to remove O-USA information from O-USA premises for an unauthorized use.  As key executives of O-USA, Thompson, Weiner, and Dinan each executed the Key Employee Agreement and agreed to O-USA's Code of Ethics and Confidentiality and Data Security policies.

**B.     Defendant's Unlawful Conduct.**

24.     Thompson was the CEO of O-USA until December 2013.  While he was CEO, Thompson conceived several entities with the idea that at least one of them would eventually directly compete with O-USA.  During his tenure as CEO of O-USA, he made the competitor concept a reality, and PHC now does just that.

25.     In the last few months of Thompson's tenure as O-USA's CEO, he created and formed PHC.  On October 25, 2013, he and Weiner, on information and belief, directed Dinan, who resides in the Eastern District of Texas (and did so while he was Senior Legal Counsel for O-USA), to have an O-USA paralegal assist him in obtaining PHC's Certificate of Formation in Delaware.  PHC was incorporated using O-USA protected computer equipment, time, and efforts to accomplish this on PHC's behalf and for its benefit.  The computer equipment, used at Thompson's direction to incorporate PHC, was to be used exclusively for or in support of the financial services provided by O-USA.  When that equipment was used, which facilitates O-USA's dealings in interstate commerce, to incorporate PHC, it not only exceeded the authorized use of O-USA's computer systems; PHC, through Dinan, had a new entity created that would become O-USA's direct competitor.  But PHC's directives did not stop there.

26.     On or about November 18, 2013, and on information and belief, Thompson and Weiner had Dinan incorporate an affiliated entity, Preston Hollow Advisors ("PHA"), in Texas with its registered office at Dinan's home address in the Eastern District of Texas, and he subsequently applied with the IRS for an EIN using his home address again.  To do so, he used O-USA's protected computers and computer systems to receive and forward communications regarding PHC's and PHA's formation to the same O-USA paralegal he directed to incorporate PHC.

27.     In total, PHC had Dinan file applications on its behalf and for its benefit with: (1) the Delaware Secretary of State to incorporate PHC; (2) the Texas Secretary of State as the organizer for PHA; (3) the IRS for an EIN as the sole member of PHC; (4) the U.S. Patent and Trademark Office for trademark and service; (5) a Trademark Assignment Cover Sheet dated April 16, 2015; and (6) a Trademark/Service Mark Amendment to Allege Use.  Each application lists PHA and/or PHC's address as Dinan's home address in the Eastern District of Texas.  While accomplishing the tasks that took place on PHC's and PHA's behalf during his employment with O-USA, Dinan communicated extensively with PHC using O-USA's protected computers and its computer systems, including without limitation to the same O-USA paralegal he directed to incorporate PHC, Thompson, Weiner, and others.

28.     The stated purpose for PHC was to own, hold, and manage equity interests in one or more limited liability companies and to conduct any other business for which a limited liability company may be organized.  On November 21, 2013, Thompson announced he was resigning his position with O-USA, effective December 31, 2013.

29.     During the Fall of 2013, Weiner commissioned a group of O-USA employees to develop a "Pitch Book" that incorporated O-USA's historical "track record" and other

proprietary data and information.  Knowing that Thompson's departure from O-USA was only a few months away, Weiner monopolized O-USA's resources to complete the project in time. PHC intended to, and did, use the Pitch Book for its own purposes.

30.     With these operational wheels set in motion, PHC's agents and representatives reached out to prospective business partners, in search of investments and funds.  For example, following PHC's incorporation, Weiner, as agent for Defendant, using ORIX protected computers, unlawfully accessed and sent the "Pitch Book"—that included O-USA's track record information, historical performance, market analysis, and the identification of a "Highly Experienced Team" consisting of twenty (20) O-USA executives and their biographies—to potential PHC investors.  Included among the O-USA executives listed and showcased in the Pitch Book (which resided on O-USA's computer network) were Dinan and Benitez, both of whom reside in the Eastern District of Texas.

31.     On November 20, 2013, the day before Thompson announced he was leaving O-USA at the end of the year, Weiner set up a private Gmail account so that he and Thompson could discuss The Plan in secret.  Weiner's O-USA protected computer contained records of Gmail communications (some of them fragmented, in the deleted files of the computer) with Thompson and third parties in pursuit of soliciting business for Defendant.  Weiner's acts were done for Defendant's benefit, to compete against O-USA and to solicit O-USA customers, in violation of O-USA's prohibition against using O-USA's computer system and his position for the benefit of any person or entity other  than O-USA, and his covenant not to disclose or use confidential or proprietary information outside the course and scope of  his duties on behalf of O-USA.

32.     Shortly after Thompson's retirement, PHC's ranks were soon filled with a steady stream of O-USA employees that PHC hired to compete with it.  Its executive suite formally came together as soon as Thompson retired.  PHC through its agents induced several O-USA (and subsidiary) executives to make the move to PHC to compete with O-USA almost immediately.  On information and belief, this inducement occurred prior to Thompson's retirement, as evidenced by the actions of at least Weiner and Dinan before December 31, 2013, and PHC enlisted Thompson's recruitment services with full knowledge of his contractual obligations of noncompetition (with O-USA) and non-solicitation (of O-USA's employees).  As a result, Weiner formally transitioned in January 2014 from his role as CEO and president of O-USA municipal finance to become PHC's managing director.  Mike Cousins became PHC's Chief Financial Officer after holding the same position at O-USA for seventeen years.  Dinan became the General Counsel in early 2014 (months after he incorporated PHC in Delaware) after serving as Director and Senior Legal Counsel for O-USA since 2001.  PHC ensured that others were not far behind, including Michel Benitez and Max Pickle, both residents of the Eastern District of Texas.

33.     On information and belief, PHC used O-USA's name, information, and reputation to begin competing with it immediately.  In fact, as stated on the landing page of PHC's website, www.phcllc.com (the "Site") the company's use of O-USA's name, personnel, and information is essential to its success:

# Welcome

Preston Hollow Capital is a Dallas-based merchant bank focused on municipal specialty finance, commercial finance and asset management. Preston Hollow Capital was formed in 2014 by a senior team from ORIX USA comprised of executive management, sourcing, credit and business operations professionals.

A true and correct copy of the homepage of the Site is attached hereto as Exhibit 1.  PHC plainly used the O-USA name on PHC's website with undue influence.  The use of O-USA's name is

not limited to what is necessary to identify O-USA, instead falsely suggesting PHC's affiliation with or endorsement by O-USA.  Indeed, the stated focus of PHC was—and remains—areas in which O-USA operated under its former executives' leadership and continues to operate to this day.

34.     This is made clear by a promotional PowerPoint presentation, created by PHC's Jim Thompson in March 2014.   The presentation comingles ORIX USA's methods and organizational structure with PHC's as if it was PHC's own.   In fact, PHC's logo from the presentation's introductory slide:



sits next to ORIX USA's name on a slide depicting "ORIX USA Businesses" information:

 ORIX USA Businesses

Moreover, information contained in several of those slides contain O-USA's confidential information – taken from O-USA's protected computers without authorization.

35.     PHC's ability to immediately hit the ground running in January 2014 was also due to the O-USA resources—former O-USA management, O-USA confidential and proprietary

information, and the associated ORIX reputation—that were utilized to fuel that success.  Indeed, PHC published a press release on January 7, 2014 announcing its "launch" by former CEO of O-USA with more than "$100 million in committed capital", a mere eight (8) days after Thompson's December 31, 2013, departure from O-USA.  The press release, a copy of which is attached hereto as Exhibit, announced that PHC would pursue diverse investment strategies including fixed income, private equity, venture capital and alternative investing.

36.     Since PHC was formed, it deliberately and methodically hired away other employees from O-USA and its subsidiaries.  But the object of this operation was not (and still is not) just to hire any employees.  Indeed, PHC has recruited employees from O-USA and its subsidiaries that it knows have extensive access to confidential and proprietary information obtained from the collective decades of experience at O-USA and its subsidiaries.  And PHC knew that the information would directly work to PHC's advantage because of its otherwise confidential and proprietary nature.

37.     Further, PHC knew that the O-USA employees who were targeted to join PHC's ranks have confidentiality agreements and fiduciary duties to O-USA and its subsidiaries.  PHC has knowingly induced and aided the former O-USA employees to breach those duties and obligations by using O-USA's confidential information for PHC's gain in a manner adverse to O-USA.  Indeed, the violated confidentiality obligations survived each employee's termination at O-USA, but PHC insured the information possessed by and accessible to those employees worked to their mutual benefit.  PHC's deliberate interference with the contracts between O-USA and its employees continues to this day.

38.     PHC also immediately began relying heavily on the O-USA name and its associated     reputation     to     jumpstart     its     success.         A     PHC     "News"     item,     at

http://www.phcllc.com/news, includes PHC's very first press release entitled "Preston Hollow

Capital,     LLC     Launched     by     Former     CEO     of     O-USA,"     located     at

http://www.businesswire.com/news/home/20140107006282/en/Preston-Hollow-Capital-LLC-

Launched-CEO-ORIX, which references "ORIX" thirteen times.

      39.    That press release advertised, in part:

> The principle that I used to guide ORIX USA investment strategy is the same that will be employed at Preston Hollow Capital. That principle emphasized investment activity across a broadly defined opportunity set and the employment of team-based investment professionals with strong generalist skill sets. . . . Preston Hollow Capital anticipates 2014 hiring to include more than 25 people with diverse financial, investment and portfolio management backgrounds. . . . Building a talented team will be as important to the success of the new platform as it was to building ORIX USA.

(*See* Exhibit 2).

      40.    This stated concept of taking O-USA's strategies and selling it as PHC's own is

realized repeatedly on PHC's website.   PHC's executives advertise their value to potential

customers as though it is O-USA's services being bought.   For Cliff Weiner: "Prior to joining

Preston Hollow Capital in January 2014, Cliff spent 17 years with ORIX USA in multiple

capacities."   For Mike Cousins: "Before joining Preston Hollow Capital, Mr. Cousins served as

CFO for ORIX USA for 17 years, where he had responsibility for accounting, tax, human

resources, IT, treasury, credit review functions and corporate development transactions including

acquisitions and due diligence support."   John Dinan: "Mr. Dinan previously served as Director

and Senior Legal Counsel for ORIX USA, which he joined in 2001 to provide a multifaceted

range of legal and investment support to the real estate, capital markets, corporate finance and

municipal investment divisions."   Greg May: "Greg previously served as Deputy General

Counsel for ORIX USA, where he provided a broad range of legal, transactional and governance

support to ORIX USA's various business lines in the investment banking, asset management, real estate finance and life sciences sectors."  May left ORIX USA in July 2014.  The list goes on and on, with other PHC leaders (such as Max Pickle, Kandice Stephens, John Bills, Nga Nguyen, and Michel Benitez) touting ORIX USA's success as their own in advertising the financial services they provide PHC's customers.   Indeed, the biographical descriptions of ten PHC employees make liberal use (at least 29 times) of ORIX or O-USA in advertising the PHC services.

41.    Even PHC's strategy, as read on www.phcllc.com/about, is not materially different from that of O-USA, as seen on www.orix.com/firm/our-business/.

42.    O-USA lists its primary services as "investment capital and asset management services to clients internationally in the corporate, real estate and municipal finance sectors."

43.    The "About" section of the PHC Web Site (the "Site"), at http://phcllc.com/about, prominently advertises that "Preston Hollow Capital was formed in January 2014 by a senior team from ORIX USA . . ." –



44.     A true and correct copy of the "About" page of the Site is attached hereto as Exhibit 3.  To be sure, the financial services advertised are the same as O-USA, and PHC goes so far as to follow its stated services with another reference to ORIX to reiterate the similarities.

45.     The HTML source code for the Site, used by search engines to gain information about the Site, also includes a reference to ORIX USA –

```
176      </header>
177      <p style="text-indent: -18.239999771118164px;">Preston Hollow Capital is a Dallas-based
      Hollow Capital was formed in 2014 by a senior team from ORIX USA comprised of executive mana
178  <script type="text/javascript">// <![CDATA[
179  (function(i,s,o,g,r,a,m){i['GoogleAnalyticsObject']=r;i[r]=i[r]||function(){
180    (i[r].q=i[r].q||[]).push(arguments)},i[r].l=1*new Date();a=s.createElement(o),
181    m=s.getElementsByTagName(o)[0];a.async=1;a.src=g;m.parentNode.insertBefore(a,m)
182    })(window,document,'script','//www.google-analytics.com/analytics.js','ga');
```

A true and correct copy of the pertinent HTML source code is attached hereto as Exhibit 4.

46.     PHC is not associated or affiliated with O-USA and has never been authorized or otherwise licensed to use the Mark or any other confusingly similar reference thereto in connection with the sale or offering for sale of PHC's services.

47.     PHC has infringed the Mark in interstate commerce by various acts, including, without limitation, the selling, offering for sale, promotion and advertising merchant bank services focused on municipal specialty finance, commercial finance and asset management and, in doing so, is unlawfully using the Mark.  This includes PHC's operation of an Internet Web site that prominently displays, advertises, and promotes its services using the name ORIX USA.

48.     PHC's use of the Mark in connection with the PHC services is without permission or authority of O-USA and said use is likely to cause confusion, to cause mistake and/or to deceive.

49.     PHC's use of the Mark in connection with the PHC services has been made notwithstanding O-USA's well-known and prior established rights in the Mark.

50.     On information and belief, PHC's unauthorized use of the Mark used in association with its services is borne from a deliberate intent to ride on the fame and goodwill of the Mark and with the deliberate intent to create a false impression as to the source or sponsorship of PHC's services or to otherwise compete unfairly with O-USA.  The goodwill that O-USA has built up in its brand through years of substantial investment and effort is put at risk by virtue of PHC's appropriation of the Mark to sell its own services.

51.     PHC's conduct has caused and, unless enjoined by the Court, will continue to cause irreparable injury to O-USA.  O-USA has no adequate remedy at law.

## V.     CAUSES OF ACTION

**COUNT 1:     Computer Fraud and Abuse Act – 18 U.S.C. § 1030**

52.     Plaintiff repeats and incorporates herein by reference the allegations above.

53.     The Computer Fraud and Abuse Act ("CFAA") applies to any computers used in interstate commerce and provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." *See* 18 U.S.C. § 1030(g).

54.     The civil action provision applies whenever a person: (1) intentionally accesses a computer without authorization or exceeds authorized access and thereby obtains information from any protected computer (18 U.S.C. § 1030 (a)(2)(C)); (2) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value (18 U.S.C. § 1030 (a)(4)); or (3) knowingly causes the transmission of a command, and as a result of such conduct intentionally causes damage without authorization to a protected computer, or intentionally accesses a protected computer without authorization and causes damage or loss (18 U.S.C. § 1030 (5)(A), (B), or (C)).

55.     Defendant violated substantive provisions of subsection §1030(a)(4) and (5), and caused loss of more than $5000 in a one-year period, in violation of subsection 1030(c)(4)(A)(i)(l).

56.     Defendant's agents exceeded their authorized access to O-USA's computers and data and by doing so obtained confidential proprietary data and information that they used to Defendant's benefit.  For example, Weiner accessed information, including the confidential and proprietary Pitch Book from the O-USA server and transmitted it to third parties for the benefit of Defendant via his O-USA email.  As set forth above, on another occasion, Weiner downloaded the Pitch Book from the O-USA server and sent it via his Gmail account to third

parties, also for the benefit of Defendant.  Weiner's conduct was a knowing and willful violation of O-USA's Code of Ethics and Data Security Policy.

57.     Weiner's wrongful use of the O-USA computers and server violated O-USA's Ethics and Data Security Policies, including but not limited to the prohibitions against dissemination of confidential proprietary information, use of his position for the benefit of any person or entity other than O-USA, conflicts of interest, release of confidential and/or proprietary information to anyone outside O-USA, disclosure or use for his own benefit O-USA's confidential and/or proprietary information without written permission of O-USA, and removal of O-USA information from the O-USA premises.

58.     Further, Weiner's unauthorized attempt to permanently delete O-USA company data from his O-USA computer was also in violation of Subsection 1030(a)(5)(A), which prohibits damaging computers without authorization.   PHC, its agents and employees also knowingly and intentionally accessed O-USA's computer system without authorization, causing damage and loss, including but not limited to when the Pitch Book was downloaded from the O-USA server onto Weiner's personal Gmail account against O-USA policy in breach of covenants and duty of loyalty to O-USA and for the benefit of Defendant in violation of subsection 1030(a)(5)(C).

59.     Finally, Defendant violated Subsection 1030(c)(4)(A)(i)(l), because due to the acts of its agents, O-USA has incurred and continues to incur significant expenses in assessing and recovering the data deleted from Weiner's computer, as well as the extent of the unauthorized access, that has resulted in a loss of more than $5,000 in any one year period.

**COUNT 2:     Tortious Interference with Contracts under Texas law**

60.     Plaintiff repeats and incorporates herein by reference the allegations above.

61.     PHC has and continues to intentionally and wrongfully interfere with the contractual relationships O-USA has with its employees.  PHC tortiously interfered in O-USA's contractual relationships with its employees, including but not limited to Thompson, Weiner, Cousins, and Dinan, when PHC induced their employment with PHC despite the employees' non-solicitation agreements, breach of the loyalty owed by the employees to O-USA, and breach of the employees' noncompetition agreements with O-USA.  PHC further tortuously interfered with these employment agreements when it induced these employees to breach their obligations to return O-USA documents and information at the conclusion of their employment with O-USA.

62.     Further, PHC tortiously interfered in O-USA's contractual relationships with its employees, such as Thompson, Weiner, and Dinan, when it prompted them into breaching their contracts with O-USA, as set forth above, to incorporate PHC, take steps to protect PHC's intellectual property to the detriment of O-USA, and solicit business prospects, despite PHC's knowledge of the prohibition of such conduct in those contracts.

63.     PHC's conduct is unjustified and without any legal excuse or privilege, thus constituting tortious interference with O-USA's contracts.  As a direct and proximate cause of this misconduct, O-USA has been damaged by lost employees, profits, customers, and business opportunities.  Further, PHC has committed this tortious interference willfully with malice or reckless disregard of O-USA's rights.

64.     Accordingly, O-USA seeks compensatory and punitive damages against PHC for its various and continuing acts of tortious interference with contract.

**COUNT 3:**     **Service Mark Infringement, False Designation of Origin and Unfair Competition under 15 U.S.C. § 1125(a)**

65.     Plaintiff repeats and incorporates herein by reference the allegations above.

66.     PHC has used the ORIX USA Mark in connection with PHC's services in interstate commerce.   PHC's acts as alleged constitute service mark infringement, false designation of origin, false representation and false description which is likely to cause confusion, to cause mistake, and to deceive as to the affiliation, connection or association of PHC with ORIX USA and as to the origin, sponsorship, or approval of PHC's services and commercial activities by ORIX USA.

67.     PHC's actions constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).   As a result of PHC's unlawful activities, PHC has been unjustly enriched and O-USA has been damaged.

68.     Upon information and belief, PHC's unlawful activities have caused and, unless enjoined by this Court, will continue to cause, irreparable injury and other damage to O-USA's business, reputation and good will in the Mark.   O-USA has no adequate remedy at law.

69.     O-USA seeks compensatory damages, disgorgement of profits, and punitive damages against PHC for its various and continuing acts of trademark infringement and unfair competition.

**COUNT 4:**     **Trademark Infringement and Unfair Competition under Texas law**

70.     Plaintiff repeats and incorporates herein by reference the allegations above.

71.     PHC's activities as stated herein constitute unfair competition and an infringement of O-USA's common law trademark rights in the Mark within the State of Texas and in violation of Texas law.

72.     PHC was on notice of O-USA's exclusive rights in the ORIX USA Mark and brand before it began advertising using the Mark.  As a result, PHC's use of the Mark for PHC's own purpose is willful and in bad faith.  As a result of PHC's unlawful activities, PHC has been unjustly enriched and O-USA has been damaged.

73.     Upon information and belief, PHC's unlawful activities have caused and, unless enjoined by this Court, will continue to cause, irreparable injury and other damage to O-USA's business, reputation and good will in its Mark.  O-USA has no adequate remedy at law.

74.     O-USA seeks compensatory damages, disgorgement of profits, and punitive damages against PHC for its various and continuing acts of trademark infringement and unfair competition.

**COUNT 5:     Conversion**

75.     Plaintiff repeats and incorporates herein by reference the allegations above.

76.     Defendant owned the confidential and proprietary business information taken and transmitted by those acting on Defendant's behalf as set forth above.

77.     Defendant induced O-USA's current and former employees—including but not limited to Thompson, Weiner and Dinan—to unwittingly misuse and misappropriate their employer's proprietary information, such as information about investors and O-USA's proprietary historical track record.  Defendant has unlawfully and without authorization assumed and exercised dominion or control over property to the exclusion of, or inconsistent with, Plaintiff's rights.

78.     Defendant has not returned all property in its possession, custody or control as they were required to do upon termination of their employment for O-USA.  Defendant took Plaintiff's information without legal justification.

79.     Plaintiff was damaged as a result of Defendant's tortious acts.  Further, PHC has committed this tortious conduct willfully with malice or reckless disregard of O-USA's rights.

80.     Accordingly, O-USA seeks compensatory damages, disgorgement of profits, and punitive damages against PHC for its various and continuing acts of trademark infringement and unfair competition.

## VI.     JURY DEMAND

81.     Plaintiff demands a trial by jury on all causes of action.

## VII.     CONCLUSION AND PRAYER

**WHEREFORE, Plaintiff prays:**

82.     That a preliminary and permanent injunction issue restraining Defendant, its agents, servants, employees, successors and assigns and all others in concert and privity with it from using the name ORIX USA in connection with the offering of financial services, from engaging in false designation of origin, from unfairly competing with ORIX USA, from tortious interference with contract, and from converting O-USA's property, pursuant to Section 34 of the Lanham Act (15 U.S.C. § 1116) and the equitable power of this Court to enforce the common law of the State of Texas.

83.     That Defendant be required to account to ORIX USA for its profits and the actual damages suffered by ORIX USA as a result of its acts of infringement, false designation of origin, unfair competition, conversion, and tortious interference with contract, together with interest, and that ORIX USA's recovery be trebled.

84.     That Defendant be ordered to surrender for destruction all nameplates, labels, advertisements, and other materials incorporating or reproducing the infringing ORIX USA service mark, pursuant to Section 36 of the Lanham Act (15 U.S.C. § 1118) and the equitable power of this Court to enforce the common law of the State of Texas.

85.     That Defendant be compelled to return all O-USA documents and materials in its possession, custody and control other than those generated for purposes of this litigation.

86.     That Defendant be compelled to pay ORIX USA's attorneys' fees, together with costs of this suit, pursuant to Section 35 of the Lanham Act (15 U.S.C. § 1117).

87.     That Defendant be compelled to pay Plaintiff's actual damages, Defendant's profits, and punitive or exemplary damages.

88.     For such other and further relief as may be just and equitable.

Dated: December 18, 2015

Respectfully submitted,

**JACKSON WALKER LLP**

By: */s/ Charles L. Babcock*
       David Folsom
       Texas State Bar No. 07210800
       Email: dfolsom@jw.com
       6002 Summerfield, Suite B
       Texarkana, Texas 75503
       (903) 255-3250
       (903) 255-3265 – Fax

       Charles L. Babcock
       Lead Attorney
       Texas State Bar No. 01478500
       Email: cbabcock@jw.com
       Carl C. Butzer
       Texas State Bar No. 03545900
       Email: cbutzer@jw.com
       Lauren E. Mutti
       Texas State Bar No. 24050042
       Email: lmutti@jw.com
       2323 Ross Avenue, Suite 600
       Dallas, Texas 75201
       (214) 953-6000
       (214) 953-5822 – Fax

Nancy W. Hamilton
Texas State Bar No. 11587925
Email: nhamilton@jw.com
John K. Edwards
Texas State Bar No. 24002040
Email: jedwards@jw.com
Joel R. Glover
Texas State Bar No. 24087593
Email: jglover@jw.com
1401 McKinney Street, Suite 1900
Houston, Texas 77010
(713) 752-4200
(713) 752-4221 – Fax

Of Counsel:
Law Office of George L. McWilliams, P.C.
George L. McWilliams
Texas State Bar No. 13877000
Email: glmlawoffice@gmail.com
Post Office Box 58
Texarkana, Texas-Arkansas 75504
Telephone: (870) 772-2055
Facsimile: (870) 772-0513

**ATTORNEYS FOR PLAINTIFF ORIX USA**


## CERTIFICATE OF SERVICE

This is to certify that on December 18, 2015, a true and correct copy of the foregoing instrument was served via the Court's Electronic Filing System on all counsel of record.



*/s/ Charles L. Babcock*
Charles L. Babcock